## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **CALVIN LEE ROBINSON as** } <br> **Administrator of THE ESTATE OF** } <br> **CALVIN LEE ROBINSON, JR.,** } <br> } <br> **Plaintiff,** } <br> } <br> **v.** } <br> } <br> **L.B. RANKIN and TODD** } <br> **EASTERWOOD,** } <br> } <br> **Defendants.** | **Case No.: 2:14–cv–01886–MHH** |

## MEMORANDUM OPINION

This case concerns the fatal shooting of plaintiff Calvin Lee Robinson's son, Calvin Lee Robinson, Jr. In this opinion, to distinguish between Mr. Robinson and his son, the Court refers to the plaintiff as Mr. Robinson and to his son as Calvin Jr. Calvin Jr. was killed when Hueytown Police Officer Todd Easterwood fired into a car in which Calvin Jr. was riding. When Officer Easterwood fired, he and his partner, Lieutenant L.B. Rankin, were attempting to arrest Calvin Jr. and the car's driver, Isaiah Brown, because the officers believed they had just seen Mr. Brown hand illegal drugs to the driver of another vehicle in a drive-by exchange. The officers were correct; in the drive-by transaction, Mr. Brown had received $20 in exchange for a small quantity of drugs. Minutes later, Calvin Jr. was dead.

Mr. Robinson asserts a claim against Officer Easterwood under 42 U.S.C. § 1983. Mr. Robinson contends that by firing into the vehicle, Officer Easterwood used excessive force to seize Calvin Jr. in violation of the Fourth Amendment. (Doc. 37, p. 2). Mr. Robinson also asserts claims against Officer Easterwood and Lieutenant Rankin under Ala. Code § 6–5–410, contending that both officers are liable for punitive damages for wrongful death under Alabama law. (Doc. 37, p. 3). Officer Easterwood asserts a defense of qualified immunity to the § 1983 claim, and both officers assert a defense of state agent immunity to the state law claim. The officers ask the Court to enter judgment in their favor on these grounds. For the reasons discussed below, the Court grants the officers' motion.

## I.      SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court views the evidence in the record in the light most

favorable to Mr. Robinson because he is the non–movant.  *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the facts evidenced by the parties, [courts] must credit the nonmoving party's version.").  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## II.   FACTUAL BACKGROUND

Calvin Robinson Jr. and Isaiah Brown were neighbors and long–time friends.  (Doc. 42–7, p. 12).  On the morning of August 22, 2012, Mr. Brown went to Homewood to pay some parking tickets and have his license reinstated.  As he returned home, he saw Calvin Jr. walking and offered him a ride.  (Doc. 66–1, pp. 50, 76–77; *see also* Doc. 47–7, p. 7, ABI Brown interview pp. 21–23).  The two eventually visited the home of Mr. Brown's sister.  (Doc. 66–1, p. 51).  While there, Mr. Brown received a phone call from a woman who wanted to buy illegal drugs.  (Doc. 66–1, pp. 83–84; *see also* Doc. 47–7, p. 10, ABI Brown interview pp. 33–34).  The buyer was Lauren Foust, an acquaintance of Calvin Jr.'s.  Calvin Jr. had given Mr. Brown's cell phone number to Ms. Foust.  (Doc. 66–1, p. 59).  Mr. Robinson and Calvin Jr. drove to an undisclosed location to pick up the drugs and then drove to meet Ms. Foust.  (Doc. 66–1, pp. 90–91).

That morning, Mr. Brown had a gun in his car. He usually stored the gun in a cinder block at his house, but the night before, he had put the gun in his car "[f]or protection, because we had went out." (Doc. 66–1, pp. 61–65, 73, 78, 80). The gun was between the front seats of Mr. Brown's car somewhere near the center console. (Doc. 66–1, pp. 66–68, 71). Mr. Brown did not remove the gun from his car when he returned home in the early hours of August 22, 2012, and he did not see the gun as he was driving his car later that day. (Doc. 66–1, pp. 69–70, 72). Mr. Brown stated that he forgot that the gun was in his car. (Doc. 66–1, p. 70).

That same morning, Lieutenant Rankin and Officer Easterwood were following up on drug–related complaints in the Brighton and Bessemer areas. (Doc. 42–2, pp. 11–12). Although they were officers in the Hueytown Police Department, they were assigned to the United Narcotics Investigation Task Force ("UNIT"). As members of UNIT, the officers frequently patrolled for drug-related offenses outside of Hueytown. (Doc. 42–2, pp. 8, 10; Doc. 49–4, p. 4). Lieutenant Rankin and Officer Easterwood wore plain clothes and patrolled in "an unmarked silver Chevrolet Malibu equipped with blue lights and sirens." (Doc. 42–2, p. 26).

The officers were patrolling along the Bessemer Super Highway when they noticed a white Ford Explorer parked in the lot of an abandoned store. (Doc. 42–2, p. 12; Doc. 47–2, p. 1). The vehicle had a number of distinguishing characteristics — a broken window and tow numbers on the rear window — that allowed the

officers to identify the Explorer as Lauren Foust's vehicle.  (Doc. 47–2, p. 1).  The officers knew that Ms. Foust was a drug–user.  (Doc. 42–2, p. 12; Doc. 42–4, pp. 7–9).  The officers parked across the street and observed Ms. Foust as she sat in her car making frequent phone calls and glancing about.  (Doc. 42–2, pp. 12–13).[1] Based on Ms. Foust's behavior, the officers' familiarity with her drug use, and their assessment of the locale as a "high drug area," the officers decided to follow Ms. Foust.  (Doc. 42–2, pp. 12–13; Doc. 42–4, pp. 8–9).

The officers followed Ms. Foust along the Bessemer Super Highway toward Brighton until she turned on Parker Springs Road into a residential neighborhood.  (Doc. 42–2, p. 14; Doc. 42–4, p. 9).  The officers drove a block further and circled back towards the intersection of Hardy Street and Parker Springs Road to regain contact with Ms. Foust.  (Doc. 42–2, p. 14; Doc. 42–4, p. 9).[2]  As the officers turned back onto Parker Springs Road, they saw Ms. Foust's vehicle stopped on Hardy Street beside a black Mazda, Mr. Brown's vehicle.  (Doc. 42–4, pp. 9–10).  The officers stopped just past the intersection of Parker Springs Road and the

---

[1] According the record, a woman accompanied Ms. Foust.  (Doc. 42–2, p. 12).  The record does not reveal the identity of Ms. Foust's passenger.

[2] During Officer Easterwood's deposition, counsel for Mr. Robinson pointed out that the street intersecting with Parker Springs Road no longer is called Hardy Street.  (Doc. 42–2, p. 14).  Pursuant to Federal Rule of Evidence 201(b)(2), the Court takes notice of the fact that the road is now called Short Blockton Avenue.

Bessemer Super Highway to observe the interaction between the occupants of the two vehicles. (Doc. 42–2, p. 15; Doc. 42–4, p. 10).

Mr. Brown's car was "driver to driver" with Ms. Foust's vehicle. (Doc. 66–1, p. 91). Mr. Brown and Ms. Foust made a hand–to–hand exchange and then drove off in separate directions. The transaction took less than one minute, and Ms. Foust paid $20 for the drugs that she bought. After handing off the drugs, Mr. Brown and Calvin Jr. left and drove towards the intersection of Hardy Street and Parker Springs Road. (Doc. 66–1, pp. 50, 76–77, 85, 89–94; *see also* Doc. 47–7, p. 3, ABI Brown interview p. 5; *see also* Doc. 47–7, p. 11, ABI Brown interview pp. 39–40; Doc. 42–2, p. 42). They slowed as they approached the intersection. (Doc. 66–1, pp. 116, 118; Doc. 47–7, p. 13, ABI Brown interview p. 48).

Meanwhile, Lieutenant Rankin and Officer Easterwood were reacting to the drug transaction. They were not close enough to the transaction to confirm that drugs were involved, but based on their training and experience, the officers believed that a drug sale had occurred. (Doc. 42–2, p. 15; Doc. 42–4, p. 10). Lieutenant Rankin also believed that he recognized the black Mazda from another hand–to–hand drug sale that he had witnessed one week earlier. (Doc. 42–4, pp. 7–8). Lieutenant Rankin made a U–turn, drove the unmarked patrol car towards the intersection, and attempted to block the Mazda as Mr. Brown reached the stop sign at the intersection of Parker Springs Road and Hardy Street. The officers

emerged from their car, drew their guns, and moved towards the Mazda. (Doc. 42–2, pp. 15, 17, 27; Doc. 42–4, p. 15–16; Doc. 42–4, p. 10; Doc. 47–7, p. 13, ABI Brown interview p. 48; Doc. 66–1, p. 95). Officer Easterwood was heading towards the driver's side of the Mazda, and Lieutenant Rankin was heading towards the passenger side. (Doc. 42–2, pp. 17–18, 44–45; Doc. 42-4, p. 17). Mr. Brown described the scene this way:

> [Officers Easterwood and Rankin] are in regular clothes, both of them jumped out with guns out. All I seen was two – it was two white boys jumped out both of them got pistols out and everything. The one on the driver's side was running to my car. He went around to my car. First thing in my mind was, "Oh, Lord, we are fixing to get robbed" or something like that. Like I said, there – would be a gun in the car. Next thing you know, he just — he run on to the side of the car, and my first thought was "go, go, go." Because I'm thinking, we was fixing to get robbed and he's got a gun out here. Whatever he was going to do, what's going to do. He up right now. He got the up, period. So my first — mind, is smashed the gas and go. When I hit the gas, I'm trying to turn back to the left, and like I said, they done block the left. My only way to go back was to the left. I'm going to the left.

(Doc. 66–1, pp. 95–96). Mr. Brown explained that as he accelerated and tried to turn left, Officer Easterwood began shooting. Mr. Brown stated: "I'm trying to go left real fast. When I'm doing that, I guess, he knew I was going to go left real fast. He started shooting. That's it." (Doc. 66–1, p. 104; *see also* Doc. 66–1, pp. 118–20; Doc. 47–7, p. 2, ABI Brown interview p. 4).[3]

---

[3] The officers testified that when they pulled up to the intersection, they activated the flashing lights and siren in their unmarked car. (Doc. 42–2, p. 16; Doc. 42–4, pp. 12, 15; Doc. 66–1, p.

Officer Easterwood testified that when Mr. Brown accelerated, he (Officer Easterwood) perceived that the Mazda was "headed toward me." (Doc. 42–2, p. 17; *see also* Doc. 42–2, pp. 18, 28). Lieutenant Rankin stated that as the Mazda veered left, "it was really close to" Officer Easterwood. (Doc. 42–4, p. 15). Officer Easterwood took a step backwards and fired two rounds at the oncoming vehicle to stop the car. (Doc. 42–2, pp. 18–19, 28, 46).

After the first two shots, the Mazda "slowed and veered to the left." Officer Easterwood perceived that the car "was still approaching" him. (Doc. 42–2, p. 18).

95). On the day of shooting, Mr. Brown stated that the officers did not immediately activate their lights. (Doc. 47–7, p. 2, ABI Brown interview p. 3; Doc. 47–7, p. 3, ABI Brown interview p. 7; Doc. 47–7, p. 12, ABI Brown interview pp. 41–42). There is no car or body cam video of the event to resolve the conflict. At the summary judgment stage, the Court accepts Mr. Brown's version of these events.

On the day of the shooting, Mr. Brown stated that he initially did not realize that the men who emerged from the unmarked car were law enforcement officers, but as the situation developed, he began to understand that they were police. (Doc. 47–7, p. 2, ABI Brown interview p. 4; Doc. 47–7, p. 3, ABI Brown interview p. 5). On the day of the shooting, Mr. Brown acknowledged that the men who got out of the unmarked car shouted, "Stop, stop, stop." (Doc. 47–7, p. 4, ABI Brown interview p. 11). Lieutenant Rankin testified that when he stopped the patrol car, he got out of the car and "mov[ed] quickly towards Brown's car," stated "Get your hands up," and observed Calvin Jr. raise his hands as he (Lieutenant Rankin) approached the passenger side of the Mazda. (Doc. 42–2, pp. 17, 28; Doc. 42–4, 12–13, 17).

During Mr. Brown's deposition, counsel for the defendants did not ask Mr. Brown about blue lights or the officers' efforts to identify themselves as they approached the Mazda. Viewing the evidence in the light most favorable to Mr. Robinson, Mr. Brown's statement to investigators and his deposition testimony concerning these unfolding events may be reconciled, so the Court accepts Mr. Brown's testimony that he initially was not aware that the men who got out of the unmarked car were police officers, but he later realized that they were police.

As it pertains to the pending summary judgment motion, Mr. Brown's perception is relevant to the analysis only to the extent that it helps explain his decision to accelerate and try to leave the scene. As discussed below, the law requires the Court to focus the summary judgment analysis on the way in which a reasonable officer would have perceived the circumstances at the intersection. *See* pp. 14-27 below.

Officer Easterwood testified that he fired another two shots because the Mazda "was still driving towards me. They were still trying to run over me and kill me." (Doc. 42–2, p. 35). Officer Easterwood acknowledges that he was trying to shoot Calvin Jr. (Doc. 42–2, pp. 19–20).[4]

Officer Easterwood fired two final shots into the Mazda, bringing the total number of shots to six. With respect to the two final rounds, Officer Easterwood explained:

> The car was still rolling and both of them were in there, and at that point, I didn't know the extent of what all had – you know, if either one of them were still – what their intentions were.

(Doc. 42–2, p. 20).[5] Lieutenant Rankin did not fire his weapon during this encounter. (Doc. 42–4, p. 15). Mr. Brown stated that the series of six shots

---

[4] In his deposition, Officer Easterwood testified that as the Mazda slowed and moved past him on his right, he looked into the passenger window and saw Calvin Jr. reaching toward the console where a stainless steel gun was resting. (Doc. 42–2, pp. 18–19, 29). Referring to Calvin Jr., Officer Easterwood testified: "He was grabbing at the gun to kill me, so I fired the next two shots." (Doc. 42–2, p. 19). Lieutenant Rankin reported that as the Mazda passed him, he saw a gun in the car. (Doc. 42–4, p. 15). According to Mr. Brown, Calvin Jr. never reached for the gun; the gun was between the console and the front passenger seat until after the shooting. (Doc. 66–1, pp. 66–68, 70; *see also* Doc. 47–7, p. 4, ABI Brown interview p. 12; Doc. 47–7, p. 5, ABI Brown interview p. 13; Doc. 47–7, p. 6, ABI Brown interview p. 17; Doc. 47–7, p. 12, ABI Brown interview pp. 43–44; Doc. 47–7, p. 13, ABI Brown interview p. 45). Because the Court views the evidence in the light most favorable to Mr. Robinson, the Court accepts the version of events that does not involve Mr. Brown's gun.

[5] Officer Easterwood also attributed the final two shots to the gun that he says he saw in the Mazda. Officer Easterwood testified: "And I was still afraid that they were going to point the gun at Rankin and I and begin a shootout or flee the vehicle with the gun, intending to kill us, or maybe go into the neighborhood and take a hostage to try to evade us from catching him. There were so many people that were in danger, and Rankin and I, I felt like I was still in grave danger with them – the vehicle still rolling and us not knowing were they going to try to shoot us." (Doc. 42–2, p. 20). Again, because Mr. Brown testified that the gun was not visible to Officer

"happened real quick. Seconds." (Doc. 66–1, p. 106; *see also* Doc. 66–1, p. 129).

Lieutenant Rankin stated that everything happened "within milliseconds." (Doc. 42–4, p. 13; *see also* Doc. 42–4, pp. 17–18). In his statement to the ABI investigators, Mr. Brown indicated that the gunfire began almost as soon as the officers emerged from their unmarked car. (Doc. 47–7, p. 14, ABI Brown interview pp. 50–51).

Officer Easterwood testified that when the Mazda came to a stop, he approached the passenger side of the car and saw that Calvin Jr. "was kind of leaning to the right . . ." (Doc. 42–2, p. 21). Officer Easterwood kept his gun trained on Calvin Jr. Lieutenant Rankin reached the Mazda and removed Mr. Brown from the car. (Doc. 42–2, pp. 21–22). Lieutenant Rankin discovered that Mr. Brown suffered a gunshot wound to his leg. (Doc. 66–1, pp. 78–79; *see also* Doc. 42–2, pp. 21–22). Lieutenant Rankin wrapped a shirt around Mr. Brown's leg as a tourniquet. (Doc. 42–4, pp. 18–19; Doc. 66–1, pp. 79–80).

Mr. Brown stated that as Lieutenant Rankin was applying pressure to the bullet wound in his leg, he told Lieutenant Rankin that there was a gun in the Mazda. (Doc. 47–7, p. 5, ABI Brown interview p. 15). Lieutenant Rankin then retrieved the gun from the Mazda, walked around the car to where Officer

Easterwood or Lieutenant Rankin, the Court does not credit this aspect of Officer Easterwood's testimony.

Easterwood was standing, and placed the gun at Officer Easterwood's feet. (Doc. 47–7, p. 6, ABI Brown interview p. 18; *see also* Doc. 42–2, p. 22; Doc. 42–4, p. 19).

Calvin Jr. was alive when the vehicle stopped; his eyes were open, and Officer Easterwood noticed that Calvin Jr. breathed with difficulty. (Doc. 42–2, pp. 21–23; Doc. 42–4, p. 19). Officer Easterwood testified that he saw no visible wound or bleeding. (Doc. 42–2, p. 23). Calvin Jr. died before medical personnel arrived on the scene. (Doc. 42–2, p. 23). Officer Easterwood did nothing to assist Calvin Jr. (Doc. 42–2, p. 23). The cause of death was a single bullet that travelled through Calvin Jr.'s aorta and both lungs. (Doc. 42–8, pp. 2, 4).

Mr. Brown stated that there were a number of bystanders who witnessed the shooting. An old couple sitting on their front porch witnessed the shooting. (Doc. 66–1, p. 141). "[T]here was a lady standing out in the street," and another man standing at the corner. (Doc. 66–1, p. 141–42). Officer Easterwood testified that the events surrounding Calvin Jr.'s death occurred in a residential neighborhood, but he does not recall seeing anyone on the street before he began shooting. (Doc. 42–2, p. 20).

## III. DISCUSSION

### A. Section 1983 Excessive Force Claim

Section 1983 affords relief when a state actor deprives an individual of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Mr. Robinson contends that when Officer Easterwood shot and killed Calvin Jr., Officer Easterwood violated Calvin Jr.'s Fourth Amendment right to be free from excessive force. *See* U.S. CONST. AMEND. IV; (Doc. 56, pp. 22–32).[6] Officer Easterwood argues that the force he used was proportional to the threat that he reasonably perceived, so that he is immune from liability under § 1983. (Doc. 56, pp. 22–32).

Qualified immunity is an affirmative defense, the availability of which is a "question of law for the court to determine." *Stone v. Peacock*, 968 F.2d 1163, 1165 (11th Cir. 1992) (quoting *Ansley v. Heinrich*, 925 F.2d 1339, 1341 (11th Cir. 1991)) (internal quotation marks omitted). "Qualified immunity protects police officers from suit in their individual capacities for discretionary actions performed in the course of their duties." *Carter v. Butts Cty.*, 821 F.3d 1310, 1318 (11th Cir. 2016). "'Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly

---

[6] The estate may bring an excessive force claim on behalf of Calvin Jr. because the officer's use of excessive force resulted in Calvin Jr.'s death. *See Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041, 1047 (11th Cir. 2011).

established statutory or constitutional rights of which a reasonable person would have known.'" *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 733 (11th Cir. 2010) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002)) (internal quotation marks omitted).

Qualified immunity allows government officials, including police officers, "'to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law.'" *Brown*, 608 F.3d at 733 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "Qualified immunity 'does not offer protection if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Carter*, 821 F.3d at 1319 (quoting *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003), in turn quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)) (alteration provided by *Holmes*).

An officer asserting the defense of qualified immunity "must first prove that he was acting within the scope of his discretionary authority." *Lee*, 284 F.3d at 1194 (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)) (internal quotation marks omitted). An officer acts within the scope of his discretionary authority when his actions "(1) [are] undertaken pursuant to the performance of his duties and (2) [are] within the scope of his authority." *Roberts*

*v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)) (internal quotation marks omitted). Here, Mr. Robinson "does not challenge [Officer] Easterwood's assertion that he was engaged in a discretionary function" during the shooting. (*See* Doc. 56, p. 22). The burden therefore shifts to Mr. Robinson to establish that Officer Easterwood is not entitled to qualified immunity.

In *Saucier v. Katz*, the Supreme Court set forth a two–prong analysis for resolving a qualified immunity defense: a court must decide (1) whether the officer violated a constitutional right and (2) whether the right was clearly established at the time of the alleged violation. 533 U.S. 194, 201 (2001); *Lee*, 284 F.3d at 1194.[7]

The Fourth Amendment, which provides to individuals a constitutional right to be free from unreasonable seizures, bars police officers from resorting to excessive force to seize a citizen. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). A district court evaluates an excessive force claim by asking whether the force used is "objectively reasonable in light of

---

[7] In *Pearson v. Callahan*, the Supreme Court held that courts may decide the second *Saucier* prong without addressing the first one. 555 U.S. 223 (2009). Still, "[a]lthough no longer mandatory, the two–part inquiry of *Saucier* provides the 'better approach to resolving'" this case. *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n. 5 (1998)).

the facts confronting the officer." *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009). When considering whether an officer's use of force is reasonable, a district court must balance carefully "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). "The intrusiveness of a seizure by means of a deadly force is unmatched." *Garner*, 471 U.S. at 9.

"In determining the reasonableness of the force applied, we look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). A district court does not analyze the circumstances "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A district court must take into account an officer's need to "make split–second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

A police officer may not use deadly force to prevent the escape of a nonviolent suspected felon. As the Supreme Court explained in *Tennessee v. Garner*:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

*Garner*, 471 U.S. at 11. An officer's use of deadly force may be reasonable where "the suspect threatens the officer with a weapon or there is probable cause to believe that [the suspect] has committed a crime involving the infliction or threatened infliction of serious physical harm" or the suspect otherwise poses an immediate threat of serious physical harm to the officer or another, deadly force is necessary to prevent escape, and the officer gives the suspect a warning about the use of deadly force, if feasible. *Garner*, 471 U.S. at 9-12. Although *Garner* provides guidance, "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383 (explaining "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'").

Mr. Brown's crime, a drive-by drug sale, is not a crime that threatened serious physical harm within the meaning of the *Garner* factors. Even small quantities of certain drugs can cause serious physical harm but not the threat of

immediate harm that *Garner* contemplates. No reasonable officer would use deadly force to apprehend an individual involved in a drive-by drug sale, and no reasonable officer would use deadly force to prevent the escape of an individual who sold a small quantity of drugs.

Here, only the threat of serious physical harm to the officers potentially supports Officer Easterwood's use of deadly force. Officer Easterwood fired a total of six shots in three separate bursts. Because the record does not establish which of Officer Easterwood's three rounds of bullets killed Calvin Jr., the Court considers the reasonableness of all of Officer Easterwood's shots.

Officer Easterwood fired his first shots shortly after he and Lieutenant Rankin exited their unmarked vehicle and began approaching the Mazda that Mr. Brown was driving. (Doc. 42–2, p. 18). Thus, the legality of Officer Easterwood's first two shots depends on whether he reasonably perceived that the Mazda posed a threat to his and/or Lieutenant Rankin's safety.

In his post–incident statement, Officer Easterwood explained that the Mazda, after coming to a stop, suddenly accelerated "directly into [his] pathway." (Doc. 47–2, p. 2; Doc 42–2, 28–29). Lieutenant Rankin says that when Mr. Brown's vehicle first pulled away, he could not see his partner, but Lieutenant Rankin's deposition testimony is consistent with the narrative that Brown's vehicle

came very close to Officer Easterwood as Mr. Brown attempted to drive away. (Doc. 47–3, p. 2; Doc. 42–4, p. 15).

Mr. Brown asserts that he coasted the Mazda towards the intersection as the officers approached the intersection in their unmarked car, and he acknowledges that he did not stop the Mazda completely. (Doc. 66–1, p. 116). As the officers got out of their car and pointed their guns toward the Mazda, Mr. Brown says that he accelerated, veering to the left to escape the armed men. (Doc. 66–1, pp. 118–19). Mr. Brown testified that when he accelerated, Officer Easterwood was off to the side of the Mazda, not in front of the car. (Doc. 66–1, pp. 104–06, 23). Mr. Brown contends that he did not use the vehicle as a weapon but instead was fleeing two armed men who emerged from an unmarked vehicle. (Doc. 66–1, pp. 95, 128–29).[8]

---

[8] The defendants contend that the Court should not consider Mr. Brown's deposition testimony because Mr. Brown frequently used the Fifth Amendment privilege and refused to answer a variety of questions. (Doc. 67, p. 2). The defendants argue that Mr. Brown selectively and improperly invoked the Fifth Amendment privilege to preserve his version of events. (Doc. 67, p. 4).

The deposition transcript indicates that although Mr. Brown answered questions concerning the events of the day in question, he refused to answer certain questions relating to his and Calvin Jr.'s prior involvement in the sale of drugs. (Doc. 66–1, pp. 41–47; Doc. 67, pp. 2–4). Mr. Brown attended the deposition without his attorney. (Doc. 66–1, p. 11). He invoked his Fifth Amendment privilege with respect to questions designed to elicit information that is irrelevant to this litigation. For example, counsel for the defendants repeatedly asked Mr. Brown where he got the drugs that he sold to Ms. Foust. (Doc. 66–1, pp. 86–87, 137–38). At one point, Mr. Brown replied, "that ain't what the subject is, why the guy shot us." (Doc. 66–1, p. 87). Mr. Brown was spot on; his objection is well–taken. Counsel also asked Mr. Brown how he acquired the gun that he placed in his car the night before the incident at issue. (Doc. 66–1, p. 62). This

The defendants argue that Mr. Brown's testimony fails to create a genuine issue of fact regarding Officer Easterwood's first two shots because Mr. Brown pleaded guilty to a state charge of reckless endangerment for his conduct on August 22, 2012, and that guilty plea prevents him from stating that he did not drive his car at Officer Easterwood. (Doc. 69, p. 9). The defendants may not rely on Mr. Brown's conviction alone to stop him from testifying that he did not drive his vehicle at Officer Easterwood. Federal courts assess the preclusive effect of a state criminal conviction under the law of the state that rendered the judgment. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008). Alabama does not permit defensive use of collateral estoppel — also called issue preclusion — unless the party invoking the earlier judgment was a party to the case in which the judgment was rendered. *See Sibille v. Davis*, 80 F. Supp. 3d 1270, 1282 (M.D. Ala. 2015) (citing *Jones v. Blanton*, 644 So. 2d 882, 886 (Ala. 1994)). Because

---

too is irrelevant. At best, these questions constitute a fishing expedition on behalf of law enforcement. The questions may have been designed to intimidate Mr. Brown and chill his testimony. If so, they were improper. The Court strikes counsel's questions and overrules the defendants' objections to Mr. Brown's invocation of the Fifth Amendment with respect to those questions.

Mr. Brown also invoked the privilege with respect to questions concerning other criminal conduct in which Calvin Jr. may have been involved. (See, *e.g.*, Doc. 66–1, pp. 138–39). In these respects, Mr. Brown's invocation of the Fifth Amendment privilege was improper; he lacks standing to invoke the Fifth Amendment with respect to Calvin Jr.'s criminal history. *See U.S. v. Argomaniz*, 925 F.2d 1349, 1353 (11th Cir. 1991); *U.S. v. Ayers*, 615 F.2d 658, 660 (5th Cir. 1980). Because this information arguably could be subject to discovery in this action to the extent that it pertains to the officers' familiarity with Calvin Jr., the Court offered the parties an opportunity to address Mr. Brown's misunderstanding of the Fifth Amendment privilege and to present additional questions to him. (Doc. 68). The parties chose not to do so.

neither Officer Easterwood nor Lieutenant Rankin was a party to the criminal action, neither of them may rely on the conviction itself to settle the factual issue of whether Mr. Brown drove his car at Officer Easterwood.

The defendants point out that Mr. Brown's deposition testimony also is inconsistent with the recitation of facts to which Mr. Brown agreed at his plea hearing. The defendants offer an excerpt from the hearing transcript during which Mr. Brown pleaded guilty to reckless endangerment. (Doc. 69–2). During that proceeding, the prosecution recited the relevant facts supporting the charge as follows: "[a]ccording to what their [the police department's] documents said, the defendant sped toward one of the officers, the officer fired his weapon at the car. And the defendant then stopped and was arrested . . . ." (Doc. 69–2, p. 3, lns. 7–11). The presiding judge then asked if Mr. Brown agreed with the prosecution's statement of facts, to which Mr. Brown responded "[y]es, sir." (Doc. 69–2, p. 3, ln. 18).

During the deposition, defense counsel asked Mr. Brown some general questions about his plea, but counsel did not discuss the particulars of the plea. (Doc. 66–1, pp. 22–25). It is not apparent from the deposition transcript that Mr. Brown is aware of a contradiction between his state court plea and his deposition testimony. Mr. Brown originally was charged with attempted murder of Officer Easterwood but eventually pleaded to reckless endangerment. (Doc. 42–12, pp. 4–

5; Doc. 69–2, p. 3). When defense counsel asked if the prosecution had accurately recounted what occurred, Mr. Brown candidly responded: "I kind of can't remember, but — as there's no way he [sic] the deal he offered me, I just went along with it, and that's what it was." (Doc. 66–1, pp. 24–25).

Although a jury may not ultimately accept this explanation, to the extent that Mr. Brown's deposition testimony conflicts with facts recited at his plea hearing, Mr. Brown has offered an explanation for the difference. Because Mr. Brown has given some explanation for the inconsistency, the issue becomes one of Mr. Brown's credibility, which a jury must assess. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986) ("A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence."); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1531 (11th Cir. 1986) ("Thus, while a district court may find that a *party's* contradictory affidavit constitutes a sham, . . . we would be unable, absent great trepidation, to affirm a similar finding with respect to a disinterested *witness'* [sic] contradictory affidavit.") (internal citation omitted) (emphasis in original).

The analysis of this question would be different if Mr. Brown was bringing a § 1983 claim in an attempt to challenge his state criminal conviction. *See Heck v. Humphrey*, 512 U.S. 477, 487 n.6 (1994). But that is not the case. A verdict in favor of Calvin Jr.'s estate would not directly affect Mr. Brown's state criminal

conviction. Subject to restrictions in the Federal Rules of Evidence, the defendants may be able to use Mr. Brown's prior statements to impeach him, but standing alone, Mr. Brown's general assent to the recitation of facts at his plea hearing does not prevent him from testifying that he did not use his car as a weapon against Officer Easterwood.

Although the Court accepts Mr. Brown's version of the encounter, his deposition nonetheless fails to create a genuine issue of fact about the constitutionality of Officer Easterwood's first two shots. Although Mr. Brown states that he was attempting to drive away from the officers, his testimony confirms that both officers were nearing his Mazda, and as he accelerated, he had little room to maneuver because the officers' car was blocking his path. *See* (Doc. 47-7, p. 13, ABI Brown interview, p. 48) ("They kind of almost tried to block me off, like I said, like they were going to hit me. It was like zoom, zoom, zoom . . . ."); (Doc. 66-1, pp. 95-96). Lieutenant Rankin already had reached the Mazda's passenger door before Mr. Brown attempted to drive away. (Doc. 66–1, pp. 118–19). Regarding Officer Easterwood's location, Mr. Brown states "[y]ou could tell where the fire was coming off of the gun out at because he's right here at this point, more to the side. You want to say the front, you can say the front. It was more to the side of the car . . . ." (Doc. 66–1, p. 123).

For purposes of summary judgment, the Court accepts that Officer Easterwood was not directly in front of the Mazda when Mr. Brown accelerated, but Mr. Brown's testimony does not undermine the reasonableness of Officer Easterwood's assessment that the Mazda was suddenly moving towards him at an accelerated pace. It is undisputed that the interaction occupied only seconds, and Officer Easterwood reacted quickly.

When an officer reasonably perceives that a suspect is driving in a manner that puts the officer's life or the lives of others in immediate peril, the officer is permitted to respond with deadly force. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005). In *Robinson*, INS agent Arrugueta attempted to stop a suspect in a Ford Escort from fleeing by placing himself between the front of the Escort and the rear bumper of another car. 415 F.3d at 1254. Agent Arrugueta pointed his weapon at the suspect, identified himself as an officer, and ordered the suspect to put up his hands. *Robinson*, 415 F.3d at 1254. Rather than comply, the suspect began to move the truck slowly towards Agent Arrugueta. *Robinson*, 415 F.3d at 1254. Agent Arrugueta fired, fatally wounding the suspect.

Despite the vehicle's slow movement, the Eleventh Circuit reasoned that Agent Arrugueta, vulnerably positioned as he was, had only seconds to assess the vehicular threat. *Robinson*, 415 F.3d at 1256. "Even if in hindsight the facts show that Arrugueta perhaps could have escaped unharmed, we conclude that a

reasonable officer could have perceived that Walters was using the Escort as a deadly weapon. Arrugueta had probable cause to believe that Walters posed a threat of serious physical harm." *Robinson*, 415 F.3d at 1256.

As *Robinson* illustrates, the question is not whether the threat was real or avoidable; it is enough that an officer who was forced to quickly interpret a suspect's actions reasonably believed that the suspect posed an immediate threat. If Mr. Brown did not drive directly at Officer Easterwood, the testimony of those who witnessed the events still indicates that Officer Easterwood had a reasonable basis for his concerns.

The Eleventh Circuit's decision in *Webster v. Beary* provides an even closer factual analogy to this case. 228 Fed. Appx. 844 (11th Cir. 2007). *Webster* involved an attempt by two officers to arrest suspected car thieves who had stopped at a gas station. *Webster*, 228 Fed. Appx. at 846. The officers exited their vehicles and approached the suspects' car on foot from different angles. *Webster*, 228 Fed. Appx. at 846. When one of the suspects, Mr. Webster, noticed the approach of an armed, plain–clothes officer, he feared that he was getting robbed and reversed his car suddenly in the direction of the other approaching officer. *Webster*, 228 Fed. Appx. at 847. The officer behind the vehicle believed that "Webster intended to run him over." *Webster*, 228 Fed. Appx. at 847. As Mr. Webster attempted to drive off, both officers fired into the vehicle, and one officer

wounded Mr. Webster. *Webster*, 228 Fed. Appx. at 847. The district court held that the officer was entitled to qualified immunity and dismissed Mr. Webster's excessive force claim.

On appeal, the Eleventh Circuit rejected Mr. Webster's argument that he only drove a short distance in reverse, such that the officers could not have reasonably perceived an imminent threat of harm. The Eleventh Circuit explained that Mr. Webster's testimony and that of his passenger were "consistent with the district court's finding that the vehicle moved backwards in a 'quick and aggressive manner.'" *Webster*, 228 Fed. Appx. at 849-50. Citing *Robinson*, the Eleventh Circuit concluded that the officers had responded in an objectively reasonable manner given that one of them was close behind the vehicle on foot when Mr. Webster suddenly reversed his car in the officer's direction.

With respect to the first two shots, Officer Easterwood acted in an objectively reasonable manner. Regardless of whether Mr. Brown intended to use the Mazda as a weapon, the evidence indicates that he drove it suddenly at an accelerating pace in the general direction of at least one officer who was nearby on foot. Officer Easterwood, standing with gun drawn and forced to assess a sudden risk from a vulnerable position, had a reasonable basis for concluding that the Mazda posed an imminent and serious threat to him. Therefore, his first two shots were constitutional.

The evidence that the Court will consider regarding the second round of shots is similar to the evidence concerning the first two shots.[9]  Lieutenant Rankin testified that after the first round of shots, the Mazda veered to the left "really close" to Officer Easterwood.  (Doc. 42–4, p. 15).  Officer Easterwood testified that the Mazda "was still driving towards me.  They were still trying to run over me and kill me."  (Doc. 42–2, p. 35).  The vehicle had made an aggressive move in Officer Easterwood's direction only seconds before, and when he fired his second round, Officer Easterwood still was standing near the moving vehicle.  It was not clear that the threat Officer Easterwood had recognized seconds before had abated. Under settled precedent, when a threat to officer safety arises and plays out in a compressed interval of time, an officer may continue firing when the threat he perceived moments before has not abated.  *See Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 822 (11th Cir. 2010). Therefore, Officer Easterwood's second two shots were constitutional.

Officer Easterwood fired the final two shots as the Mazda drove past him, still veering leftward.  (Doc. 42–2, p. 19).  With respect to those shots, Officer Easterwood stated:

---

[9] As discussed above, for purposes of summary judgment, the Court accepts Mr. Brown's testimony that the gun in his car was out of sight during the encounter with Lieutenant Rankin and Officer Easterwood.  Therefore, the Court disregards Officer Easterwood's testimony regarding Mr. Brown's gun as it relates to Officer Easterwood's decision to continue shooting into Mr. Brown's car.

The car was still rolling and both of them were in there, and at that point, I didn't know the extent of what all had — you know, if either one of them were still — what their intentions were.

(Doc. 42–2, p. 20). Although the Court has separated the rounds of shots for explanatory purposes, the Court cannot assess the reasonableness of the final shots in isolation. Rather, the Court must consider the final shots in light of the surrounding events. *See Pace v. Capobianco*, 283 F.3d 1275, 1280–81 (11th Cir. 2002). When Officer Easterwood fired the final shots at the Mazda, Mr. Brown "had used the automobile in a manner [that would give] reasonable policemen probable cause to believe that it had become a deadly weapon with which [Mr. Brown] was armed." *Pace*, 283 F.3d at 1282. Although the Mazda had passed both officers when Officer Easterwood fired his last volley, the vehicle was still moving, and it was not clear that the threat which it posed moments before had subsided. According to Mr. Brown, the whole sequence of events lasted only seconds. (Doc. 66–1, pp. 106, 129). Lieutenant Rankin stated that mere milliseconds separated one action from the next. (Doc. 42–4, pp. 13, 17). This testimony indicates that there was little time for officer Easterwood to reassess the threat. The vehicle had not stopped, and Officer Easterwood did not have an indication that the vehicle's occupants no longer were fleeing. *Cf. Pace*, 283 F.3d at 1282. Officer Easterwood had a reasonable basis for his belief that the grave

threat posed by the Mazda and its occupants persisted even as the vehicle moved past his position.[10]  Therefore, the final two shots were constitutional.

Because the Court finds that all six shots were constitutionally permissible, Officer Easterwood is entitled to qualified immunity.  Therefore, the Court grants Officer Easterwood's motion for summary judgment on Mr. Robinson's § 1983 excessive force claim.

### B. State Law Wrongful Death Claim

With respect to Mr. Robinson's wrongful death claims against them, Lieutenant Rankin and Officer Easterwood argue that under Alabama law, they are entitled to state agent immunity.  The Court agrees.

Alabama law provides immunity to state officers or employees, such as police officers, if the officers commit a tort while engaged in the exercise of a discretionary function.  *Taylor v. Shoemaker*, 605 So. 2d 828, 831 (Ala. 1992) (citing *Sellers v. Thompson*, 452 So. 2d 460 (Ala. 1984)).  Alabama's statutory provision regarding state agent immunity provides:

---

[10] The encounter between the officers and Mr. Brown and Calvin Jr. took place in a residential neighborhood.  Mr. Brown identified four individuals on the scene who saw the events including an "old man and his wife . . . on the front porch," a "lady standing out in the street," and "[an]other guy . . . on the corner." (Doc. 66–1, pp. 141–42).  Officer Easterwood understood that that the events surrounding Calvin Jr.'s death occurred in a residential neighborhood, though he was not aware of people standing outside of their homes and on the street.  (Doc. 42–2, p. 20).  In evaluating the risk to the community, a reasonable officer on the scene with knowledge of the attendant circumstances would factor into his decision regarding the use of force the fact that events were unfolding in a residential neighborhood.

> Every peace officer . . . who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof . . . shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

Ala. Code § 6–5–338(a). Discretionary acts are "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." *Wright v. Wynn*, 682 So. 2d 1, 2 (Ala. 1996); *see also L.S.B. v. Howard*, 659 So. 2d 43, 44 (Ala. 1995). Arrests and attempted arrests are among an officer's discretionary functions. *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228 (Ala. 2002).

By attempting to arrest suspects of a felony offense, Lieutenant Rankin and Officer Easterwood were engaged in a discretionary function. *See Hollis v. City of Brighton*, 950 So. 2d 300, 309 (Ala. 2006) (explaining that state–agent immunity applies when the agent is "exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law–enforcement officers' arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6–5–338(a), Ala. Code 1975."). Because the officers were performing a discretionary function when Officer Easterwood shot Calvin Jr., the burden shifts to Mr. Robinson to demonstrate that

the officers acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000). "Acts of such a nature are not considered to be discretionary." *Wright*, 682 So. 2d at 2.

Officers are not entitled to immunity and may be held liable "if they use more than a reasonable amount of force in making an arrest . . . ." *Mann v. Darden*, 630 F. Supp. 2d 1305, 1318 (M.D. Ala. 2009) (citing *Franklin v. City of Huntsville*, 670 So. 2d 848, 852 (Ala. 1995)). Alabama law provides that:

> A peace officer is justified in using deadly physical force upon another person when and to the extent that he reasonably believes it necessary in order:
>
> (1) To make an arrest for a felony or to prevent the escape from custody of a person arrested for a felony, unless the officer knows that the arrest is unauthorized; or
>
> (2) To defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force.

Ala. Code § 13A–3–27(b)(1)–(2). The Court already has found that Officer Easterwood used deadly force in response to his reasonable belief that the vehicle driven by Mr. Brown posed a serious threat. Thus, Officer Easterwood cannot be held liable for wrongful death on a theory that he used excessive force.

Mr. Robinson argues that both Officer Easterwood and Lieutenant Rankin may be held liable because they "creat[ed] a dangerous condition in which [Calvin

Jr.] . . . was injured through the foreseeable actions." (Doc. 56, p. 33). Mr. Robinson contends that Calvin Jr.'s death was a foreseeable consequence of the officers' alleged failure to comply with Hueytown Police Procedures during the attempted arrest.

In Alabama, "[p]olice officers . . . are generally immune from claims of negligence." *Fowler v. Meeks*, 569 Fed. Appx. 705, 708 (11th Cir. 2014). But officers may not be entitled to immunity if they fail to perform their duties according "'to detailed rules or regulations, such as those stated on a checklist.'" *Ex parte Mason*, 146 So. 3d 9, 12 (Ala. 2013) (quoting *Giambrone v. Douglas*, 874 So. 2d 1046, 1052 (Ala. 2003)). For a state agent to act beyond his authority, he must violate a rule or regulation that amounts to more than a general statement of principle; the rule or regulation must "remove a State agent's judgment in the performance of required acts." *Giambrone*, 874 So. 2d at 1055 (quoting *Ex parte Spivey*, 846 So. 2d 322, 333 (Ala. 2002)).

Mr. Robinson's expert, Charles Drago, opines that the officers conducted the vehicle stop in a way that violated accepted police practices and Hueytown Police Department regulations. (Doc. 49–5, p. 6). Mr. Drago's report concerns two policies of the Hueytown Police Department: a department regulation on the use of force and a department regulation prohibiting a tactic called "boxing–in" when the officers are engaged in vehicle pursuit. (Doc. 49–5, pp. 7, 9, 13). Hueytown's

policy on the use of deadly force by an officer tracks the standard that the Court applied to assess the constitutionality of deadly force.[11] The regulation does not apply to Lieutenant Rankin because he did not use deadly force, and, for the reasons discussed above, the evidence indicates that Officer Easterwood's conduct falls within the bounds of the regulation.

The regulation governing the use of the box–in technique is not clearly applicable to the facts of this case. As Mr. Drago conceded in his deposition, the officers were not engaged in vehicular pursuit when they blocked the intersection and exited their vehicle. (Doc. 42–10, p. 40). Rather, the officers were initiating a stop to conduct a felony arrest. Neither Mr. Robinson nor Mr. Drago points to a specific rule or regulation adopted by the Hueytown Police Department that would govern the situation which the officers faced. Therefore, Mr. Robinson cannot assail either officer's state agent immunity on a theory that the officers violated rules or regulations applicable to this arrest.

Before the officers attempted to arrest Mr. Brown and Calvin Jr., they witnessed Mr. Brown engage in what the officers, based on their training and experience as narcotics officers, believed was a drug deal. At a minimum, the officers had arguable probable cause to make an arrest, which is a sufficient basis

---

[11] The Hueytown Police Department regulation on the use of deadly force as reprinted in Mr. Drago's report reads: "[a]n officer shall not discharge a weapon at or from a moving vehicle unless he/she has reasonable cause to believe that his/her life or the life of another is in immediate danger of death or serious injury." (Doc. 49–5, p. 9).

for an immunity defense. *See Borders v. City of Huntsville*, 875 So. 2d 1168, 1179–80 (Ala. 2003) (holding that "arguable probable cause" is the standard under Alabama law for determining whether an officer is entitled to qualified immunity). Mr. Robinson does not offer evidence from which a juror could draw the inference that either officer acted maliciously or in bad faith. Although it is possible that Officer Easterwood and Lieutenant Rankin were negligent in the manner in which they conducted the arrest, this is the type of judgment call that Alabama's discretionary function immunity shields. Therefore, Officer Easterwood and Lieutenant Rankin are entitled to state agent immunity, and the Court grants the defendants' motion for summary judgment on Mr. Robinson's wrongful death claim.

While established precedent leads the Court to conclude on the record in this case that Officer Easterwood and Lieutenant Rankin are immune from liability for Mr. Robinson's son's death, Calvin Jr.'s death is tragic. What began as a low-level drug transaction resulted in the death of one young man and the wounding of another. Although two officers viewed the events that led to Calvin Jr.'s death, only one of them responded by firing his weapon. It is tempting to draw an inference about the appropriateness of Officer Easterwood's response by comparing it to Lieutenant Rankin's restraint and the general proposition that police officers must respond to non-violent crimes with only a degree of force

proportional to the offense.  But matters escalated quickly in this case when Mr. Brown attempted to flee in a manner that threatened officer safety.  Mr. Brown's Mazda became a weapon, and Officer Easterwood could constitutionally use deadly force to respond to what he reasonably perceived as a threat to officer safety.  Although the law does not provide redress in this instance, the Court extends its deepest sympathies to Mr. Robinson for the loss of his son.

## IV.    CONCLUSION

For the reasons discussed above, the Court enters judgment in favor of Officer Easterwood on Mr. Robinson's § 1983 claim.  The Court also enters judgment in favor of Officer Easterwood and Lieutenant Rankin on Mr. Robinson's wrongful death claims.  The Court will enter a separate order closing this case.

**DONE** and **ORDERED** this September 26, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE